# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## MEDFORD DIVISION

JOHN ERIC SMITH,

Civ. No. 1:16-cv-00690-CL

Plaintiff.

FINDINGS OF FACT &
CONCLUSIONS OF LAW

v.

UNITED STATES OF AMERICA,

Defendant.

_____

CLARKE, Magistrate Judge.

Plaintiff John Eric Smith ("Plaintiff" or "Mr. Smith") brings this Federal Tort Claims Act ("FTCA") action, pursuant to 28 U.S.C. §§ 1346(b) and 2674, against Defendant United States of America ("Defendant") to recover damages for medical negligence resulting from alleged negligent treatment, wrongful acts, and omissions by employees of La Clinica del Valley Family Health, a federally funded health care facility in Central Point, Oregon. The Court held a bench trial from May 1 through May 4, 2018, and took this case under advisement. Mr. Smith was represented by Kelly Andersen and Faith Morse. Defendant was represented by Susanne Luse. The court having heard the testimony of all witnesses, reviewed exhibits and heard arguments of

counsel, makes the following findings of fact and conclusions of law, pursuant to Fed. R. Civ. P. 52(a)(1).[1]

## FINDINGS OF FACT

Mr. Smith was born on February 11, 1972. He was forty-one years old at the time of the alleged medical negligence, which occurred in November and December, 2013. He was forty-six at the time of trial. He graduated from Scappoose High School in 1991 and attended, but did finish, a plumbing program at Portland Community College. Mr. Smith had generally steady employment in southern Oregon from 1992 to 2005, mostly in the construction field. He did have some periods of layoff and or lack of work, particularly when he worked in the Plumbers Apprentice union from 1995 to 1999. His job history is detailed in his resume, which was received as Plaintiff's Exhibit 30.

In January, 2006, he went to work for Cook Crane as an Oiler. He acquired his CVL as he was required to drive the cranes to job sites. Mr. Smith was laid off for lack of work in May 2008, at which time the country, and particularly the construction trade, was hit by what has been called the "greatest recession since the depression." He collected unemployment to some extent for about two years. The state of Oregon had extended the period allowed for unemployment. Mr. Smith was required by the state to submit three job applications each week to continue receiving unemployment compensation. There was testimony that technically the recession ended sometime in 2009, but continued to affect southern Oregon. Mr. Smith, other than some minimal informal work for friends, did not work again for wages for five and a half years leading up to the alleged medical negligence that occurred in this case in late 2013. The reasons for this are not entirely clear but involve the significant recession, some lack of motivation to seek jobs

---

[1] The parties have consented to Magistrate Judge jurisdiction over this action pursuant to 28 U.S.C. § 636(c)(1).

that paid less than his previous construction jobs, discouragement/depression, and monthly support from his mother and obligations at home.

Mr. Smith was described by family and friends as outgoing, fun loving, helpful to others, and social. He was active including fishing, hunting, camping and golfing. He frequently had neighbors over for backyard barbeques. He was helpful around the house and handy, having done such home projects as replacing the lawn and sprinkler system, building a fire pit, painting, tile work and repairing a sink.

Mr. Smith did have some relevant medical history that includes obesity, diabetes mellitus, hypertension and depression. Mr. Smith was 5 foot 6 inches tall and weighed 283 pounds just prior to the events at issue in this case. Mr. Smith's medical history is summarized in the Medford clinic notes starting on May 6, 2013. Def's Ex. 102. He was a non-smoker but did chew tobacco. Mr. Smith was diagnosed with diabetes sometime in late 2012 or early 2013. He was placed on the medication Metformin. He had some diabetes related health issues including some mention of neuropathy in his feet and skin infection and abscesses, which in part were treated with Bactrim, which is an antibiotic used to treat to Methicillin-Resistant Staphylococcus Aureus ("MRSA"). MRSA is not, however, specifically mentioned in the Medford Clinic records. Mr. Smith testified that he occasionally exercised, was losing weight and generally controlling his diabetes with medication and diet before starting treatment at La Clinica.

Mr. Smith was married to Tiffany Smith in November 2013. She has two daughters, ages nineteen and nine at the time of the marriage.

Mr. Smith transferred his medical care to La Clinica starting on November 12, 2013, with follow up visits on November 22, and December 3, 16, 19, 23 and 26.

On November 12, 2013, Mr. Smith established care with a Family Nurse Practitioner (FNP) for his diabetes. He had been out of Metformin for two weeks and his "sugars ha[d] been running 200," but had been "120 when taking his medication." He said he was regularly checking his sugar levels. He reported that he exercised some, and watched his diet. Significantly, Mr. Smith reported a "[history] of multiple MRSA rash outbreaks on torso and [left] upper thigh. None currently." MRSA is an infection caused by a type of staph bacteria that has become resistant to many of the antibiotics used to treat ordinary staph infections. It often begins as a painful skin boil and can resemble pimples or spider bites. *See* Def.'s Trial Br. 2 n.1: Mayo Clinic Staff, MRSA infection, Mayo Clinic (Sept. 9, 2015), https://www.mayoclinic.org/diseases-conditions/mrsa/symptoms-causes/syc-20375336.

On November 22, Mr. Smith returned to La Clinica and saw another FNP. He presented with "complaint of infection on head." There is also a history of his wife having MRSA. This FNP reported that Mr. Smith had a "2.5 cm round slightly indurated erythematous area on mid forehead with similar smaller appearing lesion on [left] temporal skin. No fluctuance." The nurse practitioner treated Mr. Smith with Bactrim two times a day, for seven days. Bactrim is used to treat MRSA. Mr. Smith had not been checking his blood sugar three times per day as instructed. He was given a new Glucometer because his was broken. He was reminded about the connection between recurring skin infections and blood sugars.

On December 3, Mr. Smith returned to the clinic and saw a FNP. The chart said, "continued staph/MRSA infections was treated with Bactrim by ES." He complained of a lesion on the back of his neck that started as an ingrown hair. He reported that "he has never had a culture, but wife had a MRSA diagnosis." He was treating with hot compresses. He reported a

"long h[istory] of abscesses & skin lesions." His blood sugar was high. His Medford Clinic records were reviewed. He was given Metformin and Insulin.

On December 16, Mr. Smith returned to La Clinica and the nursing intake note says "P[atient] here C/P MRSA on the back of her [sic] neck and painful x3 days." Mr. Smith reported he was treating his neck lesion with "very hot compresses." He was "in enough pain that had difficulty sleeping last night." On exam, his "entire posterior neck swollen with very large induration. Overlying skin is very excoriated & weeping moderate serosanguinous fluid." The FNP treating him had a doctor look at Mr. Smith's neck, and he agreed with a diagnosis of "cellulitis." It is not clear whether the doctor was given the complete history of MRSA set forth above. The FNP prescribed an injection of an antibiotic, Ceftriaxone. No oral antibiotics were prescribed. Mr. Smith was told to return in three days.

On December 19, Mr. Smith returned to La Clinica, at which time his neck wound was fifteen centimeters by ten centimeters (six inches by four inches). Plaintiff's Exhibit 25 is a picture of the wound taken sometime in December, 2013. He was having night sweats. The wound was draining. A culture was taken. A Q-tip was used to open the wound. He was given a four day follow up.

On December 23, Mr. Smith returned. The wound was described as "[a]bscess on posterior neck – small white opening (2mm) with surrounding erythematous mildly tender & mildly fluctuant area." The FNP used a "blunt instrument" to release fluid from the large neck wound. Mr. Smith was told to continue with warm compresses.

On December 26, Mr. Smith returned in the morning, at which time he reported three days of "severe back pain upper back worse in mornings. Onset after no injury, musculo-skeletal in nature." Mr. Smith had to be assisted into the clinic by a friend. The wound was drained.

There is a notation "[i]s getting better." The assessment was "[a]bscess and cellulitis." He was given trigger point injections of lidocaine in his periscapular region. An intake nurse note indicated he was there for "f[ollow up] for MRSA." His skin was described as "fluctuant warm erythematous area entire posterior neck. Small opening draining serous fluid." The abscess was drained and the wound packed. This was a Thursday. Mr. Smith was to follow up in the next two days. Mr. Smith indicated he would return on Monday, which would have been December 30. The culture came back in the afternoon confirming MRSA.

Mr. Smith developed significant lower progressive extremity weakness. He was taken by ambulance to Providence Hospital emergency department on Saturday, December 28. The history given was that Mr. Smith over the last three days had not really gotten out of bed, except to urinate. He had fallen four times in the last twenty-four hours. He was found to have weakness in his arms and lower extremities. An MRI was performed that, according to the radiologist, showed an epidural abscess from C2-T10. Mr. Smith was immediately transferred for a neurosurgery consult with Dr. David Walker at Rogue Valley Medical Center.

Dr. Walker evaluated Mr. Smith in the evening of December 28. The evaluation was for "[e]pidural abscess with quadriplegia." The history included that in the last few days, Mr. Smith had developed "severe neck and thoracic pain and leg weakness." He awoke that morning and could not support himself. He was also having numbness in his arms and hands. Dr. Walker performed an examination and reviewed MRI films of the spine. He confirmed an epidural abscess from C2 down to T10, with the worst cord compression at C4-5. He told Mr. Smith that an emergency laminectomy from C2 to T10 was needed to evacuate the abscess and save his life. Surgical pathology confirmed MRSA.

Mr. Smith spent the next two months in the hospital with numerous serious complications. He underwent physical, occupational and speech therapy. The discharge summary of February 28, 2014, provided the following:

Discharge Diagnoses:
MRN an epidural abscess with results being essential quadriplegia
Aspiration pneumonia with Escherichia coli
Escherichia coli lung abscess
Escherichia coli bacteremia
C. difficile colitis hospital acquired
Diabetes mellitus type 2 well controlled
Topical candidiasis
Status post tracheostomy
Acute respiratory failure status post intubation
Status post PEG
Status post C2-T10 laminectomy and evacuation of epidural abscess and decompression of epidural phlegmon December 28, 2013
Status post bronchoscopy-her extensive mucus plugging

Resolved Problems:
   Collapse of left lung
   Collapse of right lung
   Low blood pressure
   Ileus
   Septic shock
   Disorder of brain caused by toxin or poison

Pl.'s Ex. 9 (formatting in original).

Mr. Smith was in a rehabilitation unit from February 28 to March 19, 2014.

Mr. Smith's medical problems and treatments over the last four years are extensive. Mr. Smith has incurred medical bills of $1,847,009.06. Pl.'s Ex. 24. He continues to be on numerous medications. He has had two additional hospitalizations. The first was in October 2014, for "osteomyelitis left lateral malleolus" (ulceration to the left lateral ankle), and the second was in August 2017, for a UTI, sepsis and gross hematuria.

Mr. Smith went home to his house, which required some modifications. Staying in his own home is extremely important to Mr. Smith. He is an incomplete quadriplegic. He has no

use or feeling in his legs. It is not expected that he will have any further neurologic recovery in his lower extremities. He has reasonable strength and use of his dominant right arm and hand, and some use of his left arm, but impaired strength and gripping ability of the left hand. He has good cognition.

Although he has a bowel program, he at times has bowel and bladder accidents and requires catheterization. There was testimony that this should be able to be improved. Mr. Smith has suffered from significant and ongoing pressure sores/ulcers on his back, feet and ankles that require constant monitoring and podiatric treatment. Pl.'s Ex. 27, 1-23. He is at risk for lower extremity amputations in the future if an infection cannot be controlled. There was testimony that a new power wheel chair he had ordered in late 2017 may help with the pressure sores. Mr. Smith however, still had treatment from Dr. Jeffrey Zimmer, his podiatrist, in April and March 2018, for an "ulceration medial aspect of left heel and medial aspect of right heel" that healed with treatment. He wears neoprene boots, which he described in his testimony as "moon boots," day and night to help prevent skin problems on his feet. He has spasticity, which is muscle contraction and twitching, and neuropathic pain. He is at increased risk for urinary tract infections, depression, and cardiovascular, pulmonary and musculoskeletal problems, including fractures.

Mr. Smith has had in-home care from family and care providers for about six to eight hours a day. This includes his ex-wife, step daughter and aunt and home caregivers from Allcare. A Hoyer lift is used to get him in and out of bed, which he cannot do by himself. His privacy is significantly impaired because he needs assistance in the shower and with bowel and bladder issues. Videos of his daily routine were played at trial. Pl.'s Ex. 29. He has lost sexual

function. His family testified he has feelings of diminished self-worth, loneliness, isolation and being a burden on others. At times, he has been angry, frustrated and will cry.

Mr. Smith has had periodic urology visits, the last time being on July 25, 2016. He has been seen by Physiatrist Dr. Jeffrey Solomon, the last time being on January 12, 2016. He continues to see his primary care physician occasionally.

Mr. Smith was divorced in March 2017 and moved to an apartment that had some disability modifications.

He was examined by Dr. Robert Arnsdorf on November 16, 2017. Dr. Arnsdorf is a Physiatrist. He provided the following summary of Mr. Smith's medical problems and treatment in his report:

> Regarding mobility, he is nonambulatory. He transfers using a mechanical lift. He does have a standing frame that he uses when he does not have sores on his feet which would preclude its use. He has a power wheelchair. He has not tried propelling a manual wheelchair. He is not driving a car or van at this point, but is interested in doing so.
> He requires significant assistance with activities of daily living. He gets 179 hours of caregiver support to assist him per month. He notes that 7 nights a week, he is left alone overnight and he is unable to get out of his bed to a wheelchair on his own.
> His bladder is managed with Foley catheter. He has frequent urinary tract infections and is followed by urology. He had done an intermittent catheterization program, but had to do this very frequently and this was disrupting his life and his sleep. Renal ultrasound from January 2015 showed no evidence of stones or obstruction.
> His spasticity is a significant issue that he describes as "bad." His hips and knees pull into flexion which is painful for him. He is on Baclofen 80 mg a day, but has not tried other medications for his spasticity, nor a higher dose of Baclofen. He gets some benefit from Cannabis derivatives. . . .
> He has had chronic skin breakdown, especially on his feet. He did have a pressure sore on his buttocks as well, though this has healed. He blames his current wheelchair for the skin breakdown on his feet, and a new wheelchair, apparently, has been ordered. Custom fit diabetic shoes were tried and these were ineffective.
> He is not sexually active. He is unable to have an erection and has not had sexual relations since the onset of his cervical myelopathy.

Pl.'s Ex. 40.

Mr. Smith, to his credit, has some improved function in his upper extremities with the help of weekly home physical and occupational therapy visits. Mr. Smith testified that he works hard to get better. He can feed himself, grip certain cups and brush his teeth once someone else has put toothpaste on his toothbrush. He can use his cell phone. He is able to get prepared meals out of the refrigerator. He should in the future be able to exercise with an upper extremity ergometer. He has a standing frame that he can use if he has no foot sores. He has a power wheel chair and is left alone in the afternoons and at night after he gets assistance getting into bed. Mr. Smith is fearful being home alone at night. The closest fire station is about one and a half miles away. He does have an application on his phone that reaches emergency services quickly. He is able, with the assistance of medical transport vans, to get out of the house. Mr. Smith, with training, should be able to drive a specially equipped van, and possibly with proper equipment modification, be able to again hunt and fish.

The parties stipulated that based on his pre-injury health problems and post-injury medical status, Mr. Smith has a life expectancy of twenty-one years. The normal life expectancy for a forty-six-year-old male is thirty-three years.

## CONCLUSIONS OF LAW

### I. Liability

#### A. Allegations in Complaint:

Mr. Smith brings a single, but substantial, claim of medical negligence against the United States for negligent treatment received at La Clinica del Valley Family Health, a federally funded health care facility in Central Point, Oregon.

In his Amended Complaint, Mr. Smith alleges that La Clinica's care providers were

negligent in the following ways:

a) In failing to heed the history plaintiff gave at this first visit, and repeated on later visits, that in the past he had Methicillin-resistant Staphylococcus aureus (MRSA), and that he had been recently exposed to MRSA;

b) In ignoring the growing constellation of symptoms pointing to MRSA, including growth of the infected area, and its non-response to the treatment La Clinica was providing;

c) In giving plaintiff and intermuscular injection of the antibiotic ceftriaxone on December 16, even though this drug is known to be ineffective against MRSA;

d) In failing at each visit, until December 19 or 23, to culture plaintiff's infection, and then failing to act immediately and properly when the culture revealed MRSA;

e) In failing to drain the infection until December 23, and then using only a "blunt instrument" rather than a surgical tool, with the result that the attempted drainage was ineffective;

f) In doing trigger point injections to treat plaintiff's back pain on December 26, failing to comprehend that his back pain was the result of the infection now having spread to his spinal column, and that trigger point injections would have no effect in treating the infection;

g) In continuing to treat a patient whose condition and needs had exceed their abilities, skills, and/or training;

h) In failing to consult adequately (if at all) with medical doctors (inside or outside La Clinica) to obtain their advice, counsel, and judgment on how to treat plaintiff's infection;

i) In failing to refer plaintiff to a medical doctor (inside or outside La Clinica) having expertise in the treatment of infectious diseases;

j) In failing to admit plaintiff to a hospital, where he could have received proper medical care, to include (but not limited to) an infusion of antibiotics that would have been effective against MRSA; and/or

k) In failing, increasingly over time, to heed plaintiff's growing symptoms of pain, excessive sweating, decreasing functional abilities, falls, and immobility, all of which indicated that the infection that had begun in the back of plaintiff's neck had spread and was becoming a systemic infection that was growing worse hour by hour and day by day.

Am. Compl. at 2-3.

## B.    Legal Standard:

Under the FTCA, the United States is liable to the same extent as a private citizen under

the law of the state where the tort occurred. *See* 28 U.S.C. § 1346(b); *Carlson v. Green*, 446

U.S. 14, 23 (1980)). Therefore, Oregon substantive law applies. *See* Am. Compl. Neither punitive damages nor attorneys' fees are authorized under the FTCA.

Under Oregon law, to prevail on a medical malpractice cause of action a plaintiff must prove by a preponderance of the evidence:

(1) the degree of care, skill and diligence used by ordinarily careful [medical providers] in the same or similar circumstances and in the same or a similar community; (2) that defendant failed to use reasonable care and diligence in the application of that skill; and (3) that, as a result of the failure to exercise reasonable care, plaintiff sustained injuries that would not otherwise have been sustained.

*Gross v. Hacker*, 168 Or. App. 529, 534 (2000) (citing *Stevens v. Bispham*, 316 Or. 221, 227 (1993)).

## C.  Testimony of Expert Witnesses:

Mr. Smith called two highly qualified medical experts to testify that La Clinica failed to meet the standard of care owed to Mr. Smith in a number of ways set forth below.

Roseann Velez is a Doctor of Nursing Practice (DNP), Certified Registered Nurse Practitioner (CRNP), Family Nurse Practitioner (FNBC) certified by the American Nurses Credentialing Center, and an American Association of Nurse Practitioners Fellow (FAANP). Ms. Velez earned her Bachelors of Science in nursing from Wagner College in 1983, Masters in nursing from New York University School of Nursing in 1988, post-Master's degree from University of Maryland School of Nursing in 1999 and her Doctor of Nursing Practice degree from Chatham University in 2013. Ms. Velez has performed clinical work in various nursing positions at various institutions since 1983, and has also taught nursing students in various professor positions since 2002. She has also written several articles, many peer-reviewed, some of which specifically address MRSA.

Dr. David Talan received his medical degree from the University of Illinois Medical College in Chicago in 1981. He is board-certified in Emergency Medicine, Internal Medicine and Infectious Diseases. In addition to his duties as a physician, Dr. Talan has also taught medical students at the UCLA School of Medicine in various professor positions since 1986. He is currently a Professor Emeritus and has held that role since 2014. His qualifications include many committee memberships, awards, and other honors, as well as dozens of published articles, many of which pertain directly to the study and treatment of MRSA.

Both Ms. Velez and Dr. Talan agree that the standard of care was violated by La Clinica in the following ways:

a) La Clinica staff failed to appreciate, explore or follow-up on Mr. Smith's stated history of MRSA, which he informed them of at his very first visit. This was a serious omission given Mr. Smith's co-morbidities of hypertension, morbid obesity, and especially diabetes, which made him more susceptible to infections.

b) La Clinica staff also failed to appreciate, explore or follow-up on Mr. Smith's statement that his wife had been diagnosed with MRSA. Ms. Velez testified to the fact that MRSA can live in a home for up to ninety days and that Mr. Smith was likely a colonizer. This meant that the MRSA bacteria were likely living inside Mr. Smith's nose, and that a reasonable provider would have performed a swab to confirm.

c) As symptoms continued to point to MRSA, La Clinica staff gave Mr. Smith an injection of ceftriaxone — an antibiotic ineffective against MRSA — in a dosage that would have been ineffective, even if it were an appropriate drug to prescribe.

d) La Clinica medical providers failed to recognize Mr. Smith's drenching night sweats as a sign that the infection had moved into his bloodstream and begun affecting other bodily systems.

e) La Clinica performed erroneous treatments such as attempting to drain an abscess with a "blunt instrument," and performing trigger point injections to treat back pain that should have been recognized as the MRSA infection spreading to the spinal column.

f) As the infection continued to grow and spread in spite of La Clinica's treatment efforts, La Clinica failed to correctly diagnose MRSA and failed to refer Mr. Smith to a higher level of care.

Ms. Velez and Dr. Talan agree that these critical errors and failures to provide Mr. Smith with the proper standard of care led to his spinal injury. If Mr. Smith had received proper care and been properly diagnosed as having a MRSA infection, that infection could have been treated, and Mr. Smith would not be in the position he is today.

Defendant did not call any liability experts or witnesses from La Clinica.

The court finds for Mr. Smith on liability. The court finds no comparative negligence on Mr. Smith.

## II. DAMAGES

Under Oregon law, a plaintiff who suffers personal injury may recover for "objectively verifiable monetary losses," such as reasonably necessary medical costs, loss of income, and future impairment of earning capacity. Or. Rev. Stat. § 31.710(2)(a). A plaintiff may also recover noneconomic damages, meaning subjective nonmonetary losses such as pain and suffering, emotional distress, and interference with normal and usual activities. Or. Rev. Stat. § 31.710(2)(b).

Under Oregon law, with regard to future medical harm, "[t]he general rule against possible but not probable future damages was modified in the case of *Feist v. Sears, Roebuck &Co.*, 267 Or. 402, 517 P.2d 675 (1973)." *Pelcha v. United Amusement Co.*, 606 P.2d 1168. 1168 (Or. Ct. App. 1980). In *Feist*, the Court held that an injury that creates a "predisposition to the contracting of some disease, i.e., a possibility" is evidence a jury may consider because, as a matter of "common sense," a jury can award larger damages for an injury that creates the susceptibility of future medical harm than an injury that does not have that risk. 517 P.2d at 680. As a result, under Oregon law, future medical harm that is "more than merely conceivable" is admissible for a jury to consider. *Pelcha*, 606 P.2d at 1169. It is up to the jury, or in this case the Court, however, to consider what weight will be given to these possibilities in determining a reasonable award for future medical costs.

## A.    Past Medical Expenses

The evidence at trial indicated Mr. Smith incurred $1,847,009.06 in reasonable and necessary past medical bills as a direct result of the negligence of La Clinica. Pl.'s Ex. 24. The court is aware that there are issues about potential offsets and liens that may affect the final past medical bill figure that will become part of the judgment.

## B.    Future Medical Expenses

Both Mr. Smith and Defendant presented expert testimony of a physiatrist and a life care planner on the issue of future medical expenses. Dr. Robert Arnsdorf and RN Michele Cook testified for Mr. Smith, and Dr. Morgan LaHolt and Anthony Choppa testified for Defendant. The Court found all four witnesses to be highly qualified and found their testimony to be generally credible.

The Court has reviewed the Life Care Plans ("LCP") submitted by RN Cook and Mr. Choppa, and considered their testimony, as well as the testimony of Drs. Arnsdorf and LaHolt. who consulted on the LCPs of RN Cook and Mr. Choppa, respectively. The Court finds that it agrees with the recommendations made in each of the LCPs in part, and disagrees in part. The goal of the LCP is to provide needed care while preserving as much independence as possible for Mr. Smith. It is very important for Mr. Smith to remain in his own home. These findings are set forth more specifically below.

*Mr. Smith's LCP:*

Based on all the testimony, exhibits and evidence submitted, the Court disagrees with Mr. Smith's LCP in the following ways:[2]

Urologist: The Court disagrees with Mr. Smith that twelve visits per year is reasonable. This number was based on the assumption that Mr. Smith would visit the urologist monthly to change out the suprapubic catheter. Mr. Smith does not currently have a suprapubic catheter — though there was testimony from both sides that this may be something for Mr. Smith to consider — and Dr. LaHolt testified that a nurse can come to Mr. Smith's home to change the catheter, a trip to the urologist's office is unnecessary. Mr. Smith has had seven urology visits since June 2014. The Court finds that an average of two visits per year is reasonable.

Orthopedist: The Court disagrees with Mr. Smith that twelve visits per year is reasonable. The Court finds that an average of one to two visits per year is reasonable. Mr. Smith has not yet had to see an Orthopedist.

---

[2] For certain items in the LCPs, the LCP provides for a frequency of visits and also a total number of visits in Mr. Smith's lifetime. For example, Plaintiff's LCP estimates two-week hospitalizations occurring every four years for Mr. Smith's lifetime, and then estimates this will result in a total of eight visits. The parties, however, have stipulated to a life expectancy of twenty-one years for Mr. Smith. Therefore, hospitalizations occurring every four years would result in a total of five in Mr. Smith's lifetime, not eight. Where estimates like this occur in the parties' LCPs, the Court has calculated the proper total number according to the stipulated life expectancy.

Home Health RN: The Court disagrees that nearly weekly visits (fifty times per year) from a registered nurse to perform wound checks is reasonable. The Court finds that an average of one visit every other week (approximately twenty-six times per year) is reasonable.

Sleep Study: The Court disagrees with Mr. Smith that he will require four sleep studies in his lifetime. The Court finds that two sleep studies in his lifetime is reasonable.

Psychologist: The Court disagrees with Mr. Smith that fifteen psychology sessions per year is reasonable. The Court finds that an average of three sessions per year with a psychologist is reasonable. Mr. Smith has been treated by his primary care physician, but has not yet seen a psychologist.

Intensive Care Unit hospitalizations: The Court disagrees with Mr. Smith that three days, every four years, for life, is reasonable. The Court finds the entire provision for ICU stays too speculative and believes that any potential ICU stay will be provided for under the other provisions regarding hospital care.

Rehabilitation in-patient care: The Court disagrees with Mr. Smith that in-patient rehabilitation stays of seven to fourteen days, every three years, is reasonable. The Court finds that two or three such in-patient rehabilitation stays in Mr. Smith's lifetime is reasonable.

Emergency room treatment: The Court disagrees with Mr. Smith that two emergency room visits per year is reasonable. The Court finds that an average of one emergency room visit per year is reasonable.

Bone scan: The Court disagrees with Mr. Smith that yearly bone scans are reasonable. The Court finds that one bone scan every five years is reasonable.

Nerve conduction studies/electromyogram ("EMG"): The Court disagrees with Mr. Smith that he needs nerve conduction studies or EMGs to assess him for shoulder or carpal tunnel

problems. Dr. LaHolt testified that these tests are used to evaluate nerves, not shoulder pathology, and are therefore inappropriate recommendations. He also testified that carpal tunnel is more common in people with spinal injuries, but typically an overuse injury like that is found in people who use manual wheelchairs. As Mr. Smith uses a power wheelchair, the Court finds the need for these tests too speculative.

All-terrain wheelchair: The Court disagrees with Mr. Smith that the all-terrain wheelchair will need to be replaced every five years. The Court heard testimony that the all-terrain wheelchair will receive considerably less use than Mr. Smith's primary power wheelchair, which Mr. Smith also estimates will need to be replaced every five years. Given the difference in projected use, and the fact the all-terrain wheelchair will receive annual maintenance, the Court finds that the need for replacement of the all-terrain wheelchair is too speculative.

Wheelchair-accessible van: The Court disagrees with Mr. Smith that he will require a third replacement (fourth total) wheelchair-accessible van. Given the stipulated life-expectancy, the Court finds that two replacement vans in Mr. Smith's lifetime is reasonable, but a third replacement is too speculative.

In-home care provider: The Court disagrees with Mr. Smith that twenty-one hours per day of in-home care is reasonable. The Court is mindful of Mr. Smith's fears of emergency when no caregiver is present; however, the Court believes that Mr. Smith's ability to summon emergency services quickly is adequate to respond in such situations. The Court finds that ten hours per day of in-home care is reasonable.

Home maintenance: The Court disagrees with Mr. Smith that eighty hours per year of home maintenance is reasonable. The Court finds that forty hours per year is reasonable.

Case manager: The Court disagrees with Mr. Smith that eight hours per month of case manager services is reasonable. The Court finds that four hours per month is reasonable.

Home modifications: The Court disagrees with Mr. Smith that two home modifications is reasonable. The Court finds that one home modification is reasonable.

Vocational evaluation: Mr. Smith does not provide for any vocational evaluation. The Court finds that ten hours of vocational evaluation is reasonable.

Vocational training: Mr. Smith does not provide for any vocational training. The Court finds that nine months of a vocational training program is reasonable.

*Defendant's LCP:*

Based on all the testimony, exhibits and evidence submitted, the Court disagrees with Defendant's LCP in the following ways:

Primary Care Physician: The Court disagrees with Defendant that an average of one to two visits per year is reasonable. The Court finds that four visits per year, above the general population, is reasonable.

Urologist: The Court disagrees with Defendant that an average of one to two visits, every other year, is reasonable. The Court finds that an average of two visits per year is reasonable.

Orthopedist: Defendant does not provide for any orthopedic visits in its LCP. The Court finds that an average of one to two visits per year to an orthopedist is reasonable.

Podiatrist: The Court disagrees with Defendant that two visits per year is reasonable. The Court finds that twelve visits per year is reasonable.

Physical/occupational therapy: The Court disagrees with Defendant that one evaluation and one follow-up treatment sessions every five years is reasonable. Counsel for Defendant,

after hearing testimony about the occupational therapy Mr. Smith is currently receiving, agreed this care should continue at the same level. The Court agrees.

Seating evaluation: Defendant does not provide for a seating evaluation for proper wheelchair fit. The Court finds that yearly seating evaluations are reasonable.

Future hospitalizations: The Court disagrees with Defendant that one to two hospitalizations in Mr. Smith's lifetime, for an average of three days each, is reasonable. The Court finds that five hospitalizations in Mr. Smith's lifetime, for an average of two weeks each, is reasonable.

In-patient rehabilitation: Defendant does not provide for any in-patient rehabilitation. The Court finds that two or three in-patient rehabilitation stays in Mr. Smith's lifetime, for an average of one to two weeks each, is reasonable.

In-patient intravenous therapy: Defendant does not provide for any in-patient intravenous therapy. The Court finds that five such stays in Mr. Smith's lifetime, for an average of five to seven days each, is reasonable.

Emergency room treatment: Defendant provides for future emergency room visits only "as needed" and does not assign any cost to this topic. The Court finds that an average of one emergency room visit per year is reasonable.

Bone scan: The Court disagrees with Defendant that one bone scan every ten years is reasonable. The Court finds that one bone scan every five years is reasonable.

Wheelchair-accessible van: The Court disagrees with Defendant that only modifications to an existing van are necessary and compensable. The Court finds that the full cost of a wheelchair-accessible van is reasonably necessary, as well as two replacement vans over Mr. Smith's lifetime.

In-home care provider: The Court disagrees with Defendant that eight hours per day of in-home care is reasonable. The Court finds that ten hours per day of in-home care is reasonable.

Home health RN: The Court disagrees with Defendant that monthly visits from a registered nurse are reasonable. The Court finds that a visit every other week from a registered nurse is reasonable.

Case manager: The Court disagrees with Defendant that eight hours per year of a case manager is reasonable. The Court finds that four hours per month (forty-eight hours per year) from a case manager is reasonable.

In total, the Court calculates Mr. Smith's reasonable future medical costs at roughly $3,800,000. Case law and common sense dictate that this total must be discounted to present value, otherwise Mr. Smith would receive a windfall. *See Tucker v. Cascade Gen., Inc.*, No. 3:09-CV-1491-AC, 2014 U.S. Dist. WL 6085829 at *26 (D. Or. Nov. 13, 2014) (discounting future medical expenses to present value); UCJI 70.05. The Court will request additional briefing on the proper discount value for this award prior to entry of judgement.

## C.    Loss of Earning Capacity

Mr. Smith alleges that because of the negligence of La Clinica, he is no longer capable of gainful employment. He alleges loss of earning capacity.

Mr. Smith testified that he was continuing to look for work just prior to his injury in late 2013. There was however very little evidence to support that claim. Mr. Smith presented the testimony and report of Daniel Rubenson PhD, who is an economist. Dr. Rubenson calculated that at the time of his injury, Mr. Smith had a work-life expectancy of eighteen years, to about age sixty. His last employment was from 2005 through 2007 at Cook Crane, and his average annual salary was $34,493. Dr. Rubenson calculated any loss of earnings for Mr. Smith to start

in January 2014, with an annual inflation figure of 3% (average inflation since 1990) and a reduction to present value using 3.3% (average interest rate on 1 year Treasury securities over the same period). In his report, Dr. Rubenson summarized his lost earning capacity analysis as follows:

> Because Mr. Smith's employment and earnings record is intermittent, it is not reasonable to assume that he would have worked full time and consistently in the years after his injury; it is similarly unreasonable to assume that he would have not worked at all in the future. Although it is possible that, absent his injury in 2013, Mr. Smith would have immediately returned to full-time work at his former wage level, it is also possible that he would have worked on a less consistent basis. The analysis therefore presents a range of possibilities for earning capacity, ranging from full-time work at his former occupation to quarter-time work at minimum wage. These possibilities are presented in detail in Table 1, and show lost earning capacity ranging from $94,342 (assuming he would have worked post-injury on average one-fourth of the time at minimum wage) to $629,739 (assuming full-time work at his former occupation).

Pl.'s Ex. 41. Dr. Rubenson assumes a return to work on January 1, 2014, for all scenarios and no post-injury earnings.

Defendant submitted the testimony and report from forensic economist Erick West who evaluated Mr. Smith's loss of earning capacity claim. Mr. West calculated that Mr. Smith had an average annual earnings of $12,621 from 2005 to 2013. Mr. Smith had not worked for 5.6 years at the time of his injury in late 2013. Mr. West looked at the average duration of unemployment for other people seeking work during this 5.6-year period. Mr. Smith's unemployment lasted 7.5 times longer than the longest average duration of unemployment for others in the years 2008-2013. In his report, Mr. West states "it is evident that Mr. Smith was not diligently seeking gainful employment during the [5.6-year] period immediately preceding the subject incident. Therefore, it is speculative to assume that Mr. Smith would have returned to the workforce anytime close to November 2013 regardless of the subject incident." Def.'s Ex. 179.

In terms of post-injury earning capacity, Mr. West cited defendant's life care planner Anthony Choppa, who stated in his report "[i]t is clear Mr. Smith's injuries have affected his physical capacity to work. However, vocational rehabilitation services would assist in returning him to the labor market at least paying the minimum wage. Further, a short term retraining program, approximately nine months to one year, would additionally enhance his employability and wage earning capacity." Def.'s Ex. 170.

Mr. West also cited Mr. Smith's own Physiatrist, Dr. Robert Arnsdorf, who stated in his report, "Mr. Smith does have the capacity to perform some gainful employment given his relatively functional right arm and his intact cognition. I suggested he contact the Department of Vocational Rehabilitation through the State of Oregon if he is truly interested in pursuing return-to-work. Obviously, he is not going to go back to any kind of manual work as he was doing prior to his myelopathy." Pl.'s Ex. 40.

In his conclusion, Mr. West stated:

[t]he above opinions all support that Mr. Smith has the post-injury capacity to perform some type of gainful employment that pays at least the minimum wage. As of 2018, the minimum wage in Oregon is $10.75 per hour.
    Any number of post-injury hours at minimum wage would exceed Mr. Smith's documented wages in the [5.6 years] immediately preceding the subject incident. In order to achieve his 9-year pre-injury average wage of $12,621, Mr. Smith would have to obtain part-time employment with a minimum of 22.5 hours per week. In either scenario, it can be reasonably concluded that Mr. Smith has sustained zero impairment to his pre-injury demonstrated earning capacity.

Def.'s Ex. 170 (emphasis omitted).

The Court is not convinced that only looking at Mr. Smith's employment history from 2005 to 2013 is entirely fair. He had pretty steady employment prior to 2005. However, given the 5.6-year gap in employment right before he was injured, it is very difficult to determine with any degree of reasonable probability, any post-injury loss of earning capacity. However, this

Court does not find it unreasonable to think that Mr. Smith, at age forty-one, may have returned to the work force at least on some intermittent basis. But, it is speculative.

It will now certainly be a challenge for Mr. Smith to return to some type of gainful employment. However, this Court was impressed by the attitude and spirit of Mr. Smith to better his situation, including getting the needed technology and retraining to obtain employment consistent with his limitations.

The Court finds that any post-injury earning loss, which is very hard to predict, can be compensated by actually earning post-injury wages. The Court therefore does not award any damages for loss of earning capacity.

### D.     Loss of Household Services

Mr. Smith, who is now single, makes a clam for loss of household services that he no longer can perform. The evidence at trial was that in-home care providers perform cleaning, cooking and other routine home tasks. The court also allows for home maintenance as part of the life care plan. Therefore, the Court declines to award any additional sums.

### E.     Non-Economic

The clear negligence of La Clinica has been emotionally and physically devastating to Mr. Smith. The pain and suffering he has endured has been extreme. Although he has an admirable attitude and is making progress, he faces many potential serious complications. Based on all the evidence submitted to this Court at trial, the Court awards $7,000,000 in Non-Economic damages.

**DATED this $\underline{31}$ day of May, 2018.**

_____
**MAGISTRATE JUDGE MARK D. CLARKE**